and we'll hear first from Mr. Kaplan. Thank you, Your Honor. May it please the Court, I am Daniel Kaplan. I represent the appellant in this appeal, Anthony Gonzales. I will keep an eye on the clock and attempt to save about three minutes for rebuttal time. The government's case against my client, Anthony Gonzales, was constructed effectively as a Jenga tower of cyber evidence, computer-generated evidence. There were two essential pillars that the Mr. Gonzales' computer to the FBI computer of child porn and two, that this was done knowingly, that he knowingly distributed child porn. To establish that first pillar, the government relied on log files generated by a computer program called Torrential Downpour. Unfortunately, the agent, the investigator who was actually operating the program when those log files were generated, passed away before trial, so it really was strictly dependent on the log files themselves that that element was established by a different individual at trial. As far as the knowing component... Hadn't one of the witnesses you testified been involved in the, you know, development of Torrential Downpour? Yes. He testified at trial as to the foundation. He did. He did. Detective Robert Erdely was part of the development of the Torrential Downpour program, certainly quite knowledgeable in the Torrential Downpour program, and he was the one who sort of stood in for the agent who had been operating the program. But he did, of course, have to rely on the log files themselves. He acknowledged he had no part in the actual running of the investigation. As far as the second prong, the knowing prong, this element was... I mean, on something like that, I mean, the foundational rules are just that you have to have sufficient evidence to support a conclusion that the thing is what it purports to be. I mean, do I need to know the structure of how the Windows, you know, program works or how Microsoft Word works in order to know that, you know, if it stamps a time on it and I know from my experience of using it that those times tend to be correct when I save them, that isn't enough of a foundation to be familiar with the overall operation of the program? That sort of information, that sort of inference can be adequate under the first part of the two appropriate authentication standard in the Lizarraga-Torado case. But part two of 901b9 says not only do you have to describe how the processor system works, but you also have to show that it produces an accurate result. And that really is the part that was lacking here. But in my example, I don't need to know how the code works in order to know that, I've used Microsoft Word for years and I know that when I save it at 630, I then look at it and I see that it says 630 on the time. And if I've had that sort of familiarity with how it stamps and logs things, isn't that sufficient, even though I know nothing about how the actual software operates? Why isn't that a sufficient foundation in that kind of an example to be, to have familiarity with how it works and have been able to compare that with prior instances that it seemed to record things correctly? Well, I think your honor is describing maybe the type of thing that everybody basically encounters and relies on day to day. There are certainly types of things, you know, a wristwatch or something that the court could take judicial notice and they're treated to say in some context, judicial notice is adequate. There's no suggestion that these highly complicated, highly specialized investigatory computer programs that are at issue here would fit into the context where judicial notice could be appropriate. The government hasn't suggested it. So the answer to your question is, these are sufficiently complex and obscure and rather convoluted computer machinations going on and being used here that some kind of reliable, well-founded evidentiary foundation had to be presented to the jury and had to be presented to the court to show that it could meet the standard that it's shown to produce an accurate result. Did the defense move in Lemonade to keep this evidence out? Well, there was a lot of pretrial litigation, as you know, but that was focused on a couple of particular issues. So the answer to my question is no. If, well, the answer technically is yes, because the pretrial litigation was trying to keep this torrential downpour out, saying it had flaws. So yes. Not technically a motion in Lemonade, but the issue was discussed in some detail pretrial. What it was, was motions for discovery, which in large part were granted by the trial judge and much discovery and testing was conducted. So it would have been building up, I suppose, to a motion in Lemonade, perhaps technically that wasn't filed under that heading. In that context, did the defense raise the issues you're raising now? Yes. And what happened in part of that pretrial litigation, one of the types of testing the essentially general testing into the accuracy and functionality of the torrential downpour. And what Judge Campbell said in denying that particular request was that doesn't meet the discovery standard. That constitutes a fishing expedition. That's in the supplemental excerpt, page 262. And so that, I believe, goes to the government's suggestion that all of that pretrial litigation, which was admittedly lengthy and intense, would address the issue of authentication. The idea that general accuracy was addressed in pretrial litigation is not correct because that was specifically rejected as fishing. The other problem with relying on all that pretrial litigation to address the authentication issue is that there are many citations in the government's brief to the idea that the judge in an authentication objection at trial only makes a preliminary finding that there's enough evidence for the jury to find that the authentication is shown. All of that pretrial litigation was not before the jury. So it really isn't relevant to the authentication issue here. I want to make sure I understand your argument on the sufficiency. You're arguing, I believe, that there was insufficient evidence for the government to carry its burden on counts four, seven, and eight, correct? Correct. All right. There's no question there's abundant direct evidence that your client had child pornography on his computer and there's evidence apparently that there was an undercover operation where he was communicating with the FBI, correct? That his computer was sharing. Okay. Yes. All right. Fair enough. And so your position then is that absent the circumstantial evidence and the expertise offered by the government's technical witnesses, if you will, there's no evidence to show that he knew there was evidence or there was child porn on his computer. And so therefore, the government could not, as a matter of law, carry their burden on those counts, correct? Close to that. I would modify a little bit. My second argument does not rely on the first argument. Right. I'm just talking about the sufficiency at this point. Right. So even with the government's expert witnesses and even with the computer evidence, they didn't have anything that allowed a jury to find beyond a reasonable doubt that my client knew the substance of the materials underlying counts 4, 7, and 8. That he knew the substance at the time it was being distributed. All right. But there's all, the government would respond that the use of bit torrent, the fact that he accessed the computer, it was his, those types of things are more than sufficient under, I believe, Love and some of the other Ninth Circuit authorities that say, you don't have to have a confession, you don't have to have the individual sitting at his desk, you know, accessing images. Circumstantial evidence of this sort is sufficient to carry the burden of proof. So the government is, and I think what you're referring to here, is addressing a different question. There are cases like Wagespac where the argument the defendant made was, I didn't know I was distributing stuff. I'm not denying I knew the nature of the stuff. I'm just saying I didn't know it was being distributed. And of course, the way distribution happens in this type of case is a file sharing program is used and a person doesn't sit down and deliberately push a button and send things, but the file sharing program does it. Okay. That's not the argument here. I am not disputing my client knew how the file sharing worked. He apparently changed the defaults to change the rate at which things shared. I'm saying the evidence didn't show for those three counts that he knew at the time of distribution the content. What did the record show about what other things were on the computer? I mean, if the theory of reasonable doubt is that it could have been adult porn, did the computer also have a large volume of adult porn on it as well? Or was it all the porn was child porn? I don't know the answer to that. And I don't know that the record shows that unless one takes a really close look at the many page long exhibits and makes inferences. But it wasn't exactly an issue at trial to show that there was adult porn. All the porn is child porn, and then it's trading files, and they don't have an actual forensic footprint that these three files were opened. The inference that it was not child porn is a lot weaker if everything on the computer is child porn. I suppose so. I would say it's not a question of whether what it was or wasn't. It's a question of when did he know the nature of what it was? I'm sorry. Some of the files had titles, didn't they? Yes. Which were pretty suggestive. So if you look at the file names and the torrent names, the searching that goes on when you search for stuff in this context, you don't search for the files, you search for the torrents. And the torrent names, there's only one of all the torrent names that conveys child porn content. It starts with two little girls. The other ones don't really convey child porn content. And even if you look at the individual file names, the file that corresponds to that two little girls has the same title. So yes, it conveys child porn. Six out of the ten file names under count seven by my count convey child porn. All the other file names in the indictment don't convey child porn. So it can't really be based on the titles. Even as to count seven, the torrent, the name of the torrent does not convey child porn. So the idea that his knowledge could be shown by what he had apparently searched for is not supported. I would like to save the balance of my time if I could. Thank you. Thank you, counsel. We'll hear now from Ms. DeLoy. May it please the court. My name is Carla Hodes DeLoy representing the United States. Judge Campbell acted well within his broad discretion when he admitted the computer generated evidence in this case. Before trial, the defense challenged the accuracy and reliability of torrential downpour.   In response to this challenge, there was briefing by the party and the district court held three separate and extensive evidentiary hearings. As a result of these hearings, Judge Campbell allowed the defense to test with some limitations the torrential downpour. The defense hired their own forensic experts. They decided the testing they wanted to come up with. They did the live testing. They used their own equipment. And in response to this testing, Judge Campbell made specific findings regarding the accuracy and reliability of torrential downpour. Then at trial, the Detective Erdely also further supplemented the accuracy and reliability of torrential downpour. So it is the government's contention. How did he do that at trial? How did he do that at trial? He testified that he was one of the developers of torrential downpour. He testified about the validation processes that went through and went through the various checks and balances on the program to ensure that it was reliable and accurate. He testified that he examined the logs. All the logs appeared to be accurate. So he went through bit by bit explaining how he found it to be reliable and accurate. And so this satisfies like the extensive evidentiary hearings with Judge Campbell's findings supplemented by Detective Erdely's testimony at trial definitely establishes the prima facie showing the government was required to satisfy Rule 901 and the authentication objections that have been made. With this, could I, could I just, is there any issue? I thought I, I thought I read an argument from the defense about the nature of the expert or the testimony that authenticated the evidence you just discussed. And I believe that the Erdely and the other individual testified and authenticated the forensic evidence, but not as experts, as fact witnesses. And then Judge Campbell nevertheless went and gave a 702 instruction to the jury after the trial. Was there any irregularity in the means by which he characterized? Should he have given a 702 instruction before they testified? I don't recall if that was a specific issue that you answered in your brief. There was no dispute that Detective Erdely was a, was an expert. There was no formal Rule 16 notice given about him. Right. And then when, after Special Agent Jimmy Daniels passed away, then Special Agent Colon took his place. And there was no dispute between the parties that Agent Colon was also an expert, expert. And in settling the jury instructions, the court agreed it was going to give a dual rule instruction. Okay. Thank you. So, and, and. So you, I mean, so you admit that there was an error in terms of compliance with Rule 16, but your position is that it's harmless? That is correct. And the defense is not arguing that as a basis on appeal. With respect to the sufficiency of the evidence, no miscarriage of justice occurred in this case because there was sufficient evidence to allow any rational trier of fact to find that counts, that the defendant knew that counts 4, 7, and 8 contained child pornography. And you can determine this by. It's actually the same question I asked defense counsel, which is, does the record say anything about what were the nature of the other files on the computer? I mean, was there a large volume of adult pornography on the computer? Your Honor, the record does not show what the percentage of child pornography versus other files or adult pornography were. There was no specific testimony asked to that. However, if the court were to look at Exhibit 80, which is at 3 ER 775, that gives a list of the titles of the uTorrent file. And you can see that many of these titles indicate child pornography. More importantly, regarding sufficiency of the evidence is Exhibit 81. And Exhibit 81 is located at 3 ER 775. And in Exhibit 81, what it does is Exhibit 80 lists the torrent files alphabetically. Exhibit 81 lists the torrent files by the date and time. And if you were to look at this, if you were to look at this exhibit specifically, ER, like I said, ER 775, you will. I'm sorry. I gave you the wrong ER number. I apologize. It's 7 ER 1724. I apologize. That's the correct number. 7 ER 1724 is the correct number for Exhibit 81. I apologize. If you look at that, that lists the torrent files by the date and time. And if you look at count four, you will see the Asi Simama Linda torrent file name. And then immediately thereafter, you will see three other files that indicate that these are child pornography files. And the same happens with regard to count seven and count eight. If you were to look at the time that he looked at the counts in count seven and eight, all of the files directly thereafter contain child pornography names, thereby giving easily for the jury to infer that at the time he was looking at count four, seven, and eight, based on the other files and the file names around the exact same time immediately after, he was also looking for more child pornography. And this is just one of the many circumstances the jury could take into account when determining that there was sufficient evidence regarding the nature of counts four, seven, and eight. Can I ask you about the payment schedule issue? Is it true? I think I saw a suggestion in the briefing that the BOP did, in fact, raise the rate of payment above what the district court had said. Is that correct? That is what the record shows, that yes, in September of 2022, the defendant's minimum contract under the IFRP where his amount is now $100. So is that setting of that amount at the higher level, is that due to his voluntary choice or is that a consequence of the fact that the judgment orders him to be part of that program? Well, two things. The first of all, the judge properly set the payment schedule at a minimum of $25 per hour. And the entering into the IFRP is a voluntary decision by the defendant. But it doesn't look voluntary here when it's commanded as part of the judgment. That's the problem. Then you put them together and it looks like he's delegating to the BOP the authority to raise it, which we've said he can't do. Correct. Based on, I understand that appearance, but based on this court's decision in Lemoyne and Ward, the court still set the proper payment and is not mandating that he participates in the IFRP. The defendant can choose to refuse the IFRP. He could have declined to participate in that program despite what it says in the judgment. That is correct. He could decline to participate in that. Then instead, restitution payments would have been made. If he decided to make restitution payments, he would have made them directly to the court rather than through the IFRP. At the minimum set by the district. Correct. That is correct. What was that issue is whether the court improperly delegated its duty to set a payment restitution schedule, which it did not. How do we know from the record that he could decline to participate in the program? Well, as this court has held in Lemoyne, the IFRP is a voluntary program. So, the defendant can choose to. Did the judgment look the same as the judgment here in that case, or was it different? The only difference between the wording in Lemoyne, the wording said that the court ordered him to, the defendant in that case, to pay at a rate of not less than $25 per quarter and pursuant to the Bureau of Prisons Inmate Financial Responsibility Program. The only difference is in this case, it says the defendant should pay at a rate of not less than $25 per quarter and shall be paid through the BOP Inmate Financial Responsibility. So, the only difference is the word shall. In Lemoyne, it said pursuant to. I don't know if it's material or not, or has been spoken to by the Ninth Circuit, but all of those judgments roughly command, or use the word shall, participate in the IFPR. And so, is the fact that a defendant wouldn't know that necessarily consequential? Well, the defendant is allowed to file a motion with the court to modify his payment schedule, and he is made aware that the IFRP is a voluntary program. Who does that? Who makes him or her aware of that? That would be the, when he goes to the Bureau of Prisons and he enters, whether or not he enters into the Inmate Financial Responsibility Program, and he signs the paperwork or decides to refuse it. Now, this is not part of the record, but in preparing for oral argument and talking to Bureau of Prisons, the defendant's payment schedule has. This is not in the record? No. I will not talk about it then. So, but under this court's Lemoyne and Ward case law, then the district court did not improperly, it did not improperly, unlawfully delegate its authority to set a payment restitution schedule, and if there were any errors, not plain error under those cases. So we ask that you affirm. Thank you, Your Honor. With respect to the payment schedule, the IFRP in and of itself is indeed a voluntary program, and the court did say that in Lemoyne. However, when the judgment in an individual defendant's case says, these are your payments and they shall be made through the IFRP, it is no longer voluntary. And the government has represented, that doesn't mean what it says, but if I were in Mr. Gonzalez's position, I don't think I could rely upon what the government said in an argument when the judgment says, I shall pay these through the IFRP. So do you agree that the standard of review for this issue is plain error? Yes, this was not challenged. On, Judge, the question that was raised about the proof under 4, 7, and 8, the evidence the government used at trial to show knowledge of content, knowledge of substance, at the appropriate time, the time of distribution, were the jump lists that were produced by that he opened and viewed these files when they were being distributed at that same time. But they explicitly had the witness acknowledge on the stand, as far as 4, 7, and 8, there is no jump list to show that. So that was really the flaw, the hole in the government's case for those three counts. As far as the idea of adult porn, I would direct the court to supplemental excerpts, page 348, that's a transcript of the interview between the defendant and the agents around the time of his arrest, where they asked him, and they asked him at a point in time during that interview, by which point he had dropped his denials and he was essentially admitting everything. So at that point in the interview, the agent said, well, was this a matter of you just sort of growing tired of adult porn? And he said, no, no, no, I never got tired of adult porn. So there is certainly evidence that it wasn't exclusively child porn that Mr. Gonzalez was doing on his computer, was downloading. And, of course, there was evidence affirmatively put into the record by the government that at the time of count 8, at the time of that material being shared with the FBI computer, Mr. Gonzalez was going out to a gaming platform and creating an email account. So there was clearly many different things he was doing on his computer. It wasn't like he sat down and did nothing but download child porn. And the records of his activity on the computer are very extensive. They show lots of different things going on around the time frame when he was doing these activities that underlie the charges. If the court has any further questions. All right. Thank you, counsel. And thank both counsel for your helpful arguments in the case. And the case just argued will be submitted.
judges: HAWKINS, COLLINS, Murphy